# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

UNITED STATES OF AMERICA,
the States of CALIFORNIA, COLORADO,
DELAWARE, FLORIDA, GEORGIA,
HAWAII, ILLINOIS, INDIANA, IOWA,
LOUISIANA, MARYLAND, MICHIGAN,
MINNESOTA, MONTANA, NEVADA, NEW
JERSEY, NEW MEXICO, NEW YORK,
NORTH CAROLINA, OKLAHOMA, RHODE
ISLAND, TENNESSEE, TEXAS, VERMONT,
and WASHINGTON, the Commonwealths of
MASSACHUSETTS and VIRGINIA, and THE
DISTRICT OF COLUMBIA,

        *Plaintiffs*,

        *ex rel.*

[UNDER SEAL]

        *Plaintiff-Relator*,

v.

[UNDER SEAL]       ,

        *Defendants*.

Case No.   3:17-00327-JMC
        _____

**JURY TRIAL DEMANDED**

**COMPLAINT**

**Filed Under Seal pursuant to the
False Claims Act, 31 U.S.C. § 3730
(b)(2), and other similar state and local
statutory provisions**

# FILED IN CAMERA AND UNDER SEAL

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, and WASHINGTON, the Commonwealths of MASSACHUSETTS and VIRGINIA, and THE DISTRICT OF COLUMBIA, | Case No. _____  **JURY TRIAL DEMANDED**  **COMPLAINT**  **Filed Under Seal pursuant to the False Claims Act, 31 U.S.C. § 3730 (b)(2), and other similar state and local statutory provisions**  # FILED UNDER SEAL |

*Plaintiffs*,

*ex rel.*

PATRICIA CROCANO,

*Plaintiff-Relator*,

v.

TRIVIDIA HEALTH, INC., TRIVIDIA HEALTHCARE SYSTEMS, LLC, and TRIVIDIA MEDITECH, LLC,

*Defendants*.

## I.        INTRODUCTION

1.      Defendants Trividia Health, Inc. ("**Trividia Health**"), Trividia Healthcare Systems, LLC ("**Trividia Systems**"), Trividia Meditech, LLC ("**Trividia Meditech**"), and Trividia Manufacturing Solutions, Inc. ("**Trividia Manufacturing**," and collectively "Defendants" or "**Trividia**") knowingly manufactured, sold, and distributed into interstate commerce defective TRUEtest™ ("TRUEtest") glucose test strips, which are used by diabetics to measure their blood glucose levels in order to determine how much insulin they need.

2.      Trividia's TRUEtest blood glucose strips were designed for exclusive use with its TRUEresult meter and its companion TRUE2go meter as pictured below):[1]

 

---

[1] The TRUE2go meter (not pictured) was created for its portability.  About the size of a quarter, it was small enough to fit in a pocket or purse, allowing customers to test blood glucose anywhere. *See* http://www.businesswire.com/news/home/20091005005121/en/Home-Diagnostics-Launches-TRUE2go-Colors  It used TRUEtest strips exclusively, and when the TRUEtest strip was discontinued, it was likewise discontinued.

Diabetic patients put a drop of blood on a TRUEtest strip then put the strip into the TRUEresult or TRUE2go glucose meter to obtain their glucose levels.  Trivdia's TRUEtest strips have been defective and producing inaccurate readings since 2013.

3.    Government-funded health care programs paid for millions of Triv, Trividia's defective TRUEtest strips.  For example, in 2013, Medicare paid approximately $489 million for home blood-glucose test strips dispensed to Medicare beneficiaries nationwide.[2]  Through June of 2016, roughly 11% of Medicare's spending on diabetes test strips was spent on worthless Trividia TRUEtest strips that provided grossly inaccurate glucose readings and jeopardized the health and lives of beneficiaries.  Thus, Trividia placed countless lives at risk of injury and death and defrauded Medicare of approximately $188 million, in violation of the False Claims Act, 31 U.S.C. § 3729 *et seq*. and analogous state statutes.

4.    The root cause of the TRUEtest strips' defect and Trividia's fraud stems from a manufacturing defect that Trividia knew about but could not correct.  In 2013, Trividia purchased a new machine, housed in its Florida complex, to manufacture its TRUEtest glucose strips.  This machine had a defect that prevented proper sealing and caused the strips to be prematurely exposed to air.  This exposure rendered the strips defective and incapable of generating a proper reading of a patient's blood glucose level, leading to potentially fatal results.

5.    Trividia promptly learned of the defect in its new machine through an immediate and massive surge in customer complaints reporting that the TRUEresult meter was providing inaccurate readings.  And in 2015, Relator learned that outside engineers had confirmed to Trividia that the machine could not be fixed.  Rather than replace the machine, issue a prompt recall of the defective strips, or notify the Government Programs and others of the defects, as required by

---

[2] *See* https://oig.hhs.gov/oas/reports/region9/91502001.pdf p. 4

relevant statutes and regulations, Trividia waited nearly three years, until, June 28, 2016, to initiate a voluntary recall of TRUEtest along with three other brands.  In its belated recall, the company conceded that the impacted test strips were exposed to air, causing the strips to fail and the meters reading them to "provide incorrect low blood glucose results."

6.      Compared to the TRUEtest strip, the other test-strip brands were far less impacted by the recall.  Whereas 160 TRUEtest strip lots were recalled, only 30 TRUEbalance[TM] lots were recalled and only 6 TRUEread[TM] lots were recalled.  Aside from the TRUEtest strips, all other test-strip brands remain on the market.  Only the TRUEtest strip and the TRUEresult[TM] ("TRUEresult") and TRUE2go meters that read this particular strip have been discontinued.[3]

7.      Trividia's senior management was aware of this defect well before it chose to recall the TRUEtest strips and TRUEresult meter.  Trividia kept these products on the market despite knowledge of the manufacturing defect from hundreds of complaints that the TRUEresult meter was giving inaccurate readings.  One complaint in November 2015 was from Ruth Saunders of Sweet Success – a high-risk pregnancy clinic serving more than 300 patients. She informed Trividia that inaccurate readings were "putting many of [Sweet Success's] patients at risk for pregnancy related complications."  This complaint attributed the death of a fetus to the meter's inaccurate reading, stating the following:

> Last week we had a 37 week old baby with fetal demise and that patient was on a True result meter. Though I do not believe I can fully prove that was caused by the poorly made True Result meter. I do believe this meter may have played a part, as medication doses are

---

[3] The TRUEresult and TRUE2go meters and the TRUEtest strips function as a unitary system. Indeed, the FDA reviews and approves blood glucose meters as part of a system that includes the meter, test strips, and – where applicable – lancing devices and control solutions.  *See, e.g.*, http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/InVitroDiagnostics/ucm227935.htm  The TRUEresult and True2go meters did not read any other brand of test strips, and the TRUEtest strips were not used in any of Trividia's other meters.

adjusted related to the patients' blood glucose values. This meter is putting providers a[t] risk of inaccurately assessing and treating patients.[4]

8.    Around the time that Ms. Saunders' complaint was received, senior management discussed recalling the product, but opted not to do so because a recall would impede corporate profitability and prevent the company from paying 2015 Christmas bonuses.  Accordingly, Defendants kept the TRUEtest/TRUEresult system on the market for another six months, and it continued to malfunction and jeopardize the health and lives of its users.

9.    The problems experienced with the test strips implicate the Federal False Claims Act and state analogs because Trividia has contracts with several government-funded health care programs.  Further, many diabetics are eligible for reimbursement of their purchases under the Government Programs. *See United States ex rel. Roop v. Hypoguard USA, Inc*., 559 F.3d 818, 820 (8th Cir. 2009).  Reimbursement claims for test strips are often submitted to the Government Programs by the distributors for their sales to individuals and nursing homes. *Id*. at 820.  By knowingly manufacturing, selling, and distributing medically risky and worthless test strips, Trividia caused the Government Programs to pay for claims that were not reimbursable and otherwise would not have been paid.[5]

10.    A large percentage of TRUEtest users were Medicare patients.  Indeed, in a November 2016 data brief, the U.S. Department of Health & Human Services determined that Defendants' TRUEtest strip represented 11% of all Medicare claims for mail order diabetes test

---

[4] If a meter is reading higher than actual sugar levels, patients inject themselves with a higher dose of insulin, and they can go into a diabetic coma, causing permanent injuries and even death. Likewise, if the result is too low, patients will not use enough insulin to lower blood sugar to safe levels, which can lead to headache, vomiting, ketoacidosis, and, in the case of pregnant women, fetal death.

[5] *See, e.g.*, 42 U.S.C. §1395y(a)(1)(A) (limiting reimbursement to "reasonable and necessary" services and products); *see also infra* ¶¶ 24-34.

strips for the three-month period of April to June 2016.[6]  Thus, there is no question that Trividia sought and obtained reimbursement from Medicare for defective products that placed patients at risk of harm and were not reimbursable by statute.

## II.        JURISDICTION AND VENUE

11.    Relator brings this action on behalf of herself and the United States, for violations of the False Claims Act, 31 U.S.C. §§ 3729-3733, and on behalf of the States of California, for violations of the California False Claims Act, Cal. Gov't Code § 12651 *et seq*., Colorado, for violations of the Colorado Medicaid False Claims Act, Colo. Rev. Stat. §§ 25.5-4-303.5, *et seq*., Delaware, for violations of the Delaware False Claims and Reporting Act, 6 Del. C. § 1201 *et seq*., Florida, for violations of the Florida False Claims Act, Fla. Stat. Ann. § 68.081 *et seq*., Georgia, for violations of the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq*., Hawaii, for violations of the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq*., Illinois, for violations of the Illinois False Claims Act, 740 ILCS 175/1 *et seq*., Indiana, for violations of the Indiana False Claims and Whistleblower Protection Act, Burns Ind. Code Ann. § 5-11-5.5-1 *et seq.*, Iowa, for violations of the Iowa False Claims Act, Iowa Code 685 *et seq.*, Louisiana, for violations of the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:437.1 *et seq*., Maryland, for violations of the Maryland False Claims Act, Md. Code Ann., Health–Gen. § 2-601 *et seq*., Massachusetts, for violations of the Massachusetts False Claims Act, Mass. Ann. Laws ch. 12, § 5B *et seq*., Michigan, for violations of the Michigan Medicaid False Claims Act, Mich. Comp. Laws Serv. § 400.601 *et seq*., Minnesota, for violations of the Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq*. , Montana, for violations of the Montana False Claims Act; Mont. Code Anno. § 17-8-401 *et seq*., Nevada, for violations of the Nevada False

---

[6] *See, e.g.*, https://oig.hhs.gov/oei/reports/oei-04-16-00470.pdf

Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq*., New Jersey, for violations of the New Jersey

False Claims Act; N.J. Stat. § 2A:32C-1 *et seq*., New Mexico, for violations of the New Mexico

Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq*., New York, for violations of the

New York False Claims Act, N.Y. State Fin. Law § 187 *et seq*., North Carolina, for violations of

the North Carolina False Claims Act, N.C.G.S. § 1-605 *et seq*., Oklahoma, for violations of the

Oklahoma Medicaid False Claims Act, 63 Okl. St. § 5053 *et seq*., Rhode Island, for violations of

the Rhode Island False Claims Act; R.I. Gen. Laws § 9-1.1-1 *et seq*., Tennessee, for violations of

the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq*., Texas, for

violations of the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et

seq*., Vermont, for violations of the Vermont False Claims Act, 32 V.S.A. § 632 *et seq*., Virginia,

for violations of the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq*.

and Washington, for violations of the Washington Medicaid Fraud False Claims Act, Rev. Code

Wash. § 74.66 *et seq*., and the District of Columbia, for violations of the District of Columbia

False Claims Act, D.C. Code § 2-381.01 *et seq*. (the "State Claims"), and, pursuant to 26 U.S.C. §

62(a)(20), seeks damages in connection with violations of 31 U.S.C. §§ 3729-3733 and the State

Claims.

12.    Relator has provided a copy of the complaint, a written disclosure, and material

information to the United States and each of the State Plaintiffs prior to the filing of this Complaint.

13.    This Court has federal subject matter jurisdiction over this action pursuant to 28

U.S.C. § 1331 and 31 U.S.C. § 3732 and supplemental jurisdiction over the State Claims pursuant

to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

14.    This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. §

3732(a) because Defendants can be found in and transact business in this District.  In addition,

many acts prohibited by 31 U.S.C. § 3729 occurred in this District. 31 U.S.C. § 3732(a).

15.   Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District.  For example, the defective products were sold, distributed, and used in this District. Many South Carolina providers, such as Molina Healthcare of South Carolina, also once covered the TRUEtest strips and TRUEresult blood glucose system as its exclusive, preferred brand of diabetic testing supplies.

16.   Relator's claims and this Complaint are not based upon prior public disclosures of allegations or transactions in a Federal criminal, civil, or administrative hearing in which the Government is already a party, or in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation, or from the news media, as enumerated in 31 U.S.C. § 3730(e)(4)(A).[7]  Nor are these claims based on any public allegations or complaints in which any of the State Plaintiffs are a party.

17.   To the extent there has been a public disclosure unknown to the Relator, the Relator is the "original source" under 31 U.S.C. § 3730(e)(4)(B).  Relator has direct and independent material knowledge of the information on which the allegations are based and has voluntarily provided the information to all of the Plaintiffs before filing this *qui tam* action based on that information.  *Id*.

III.   PARTIES

A.  PLAINTIFFS

18.   Plaintiff-Relator **Patricia Crocano** ("Relator"), a trained nurse, was employed by

---

[7] To the extent that conduct alleged in this Complaint occurred prior to March 23, 2010, the prior versions of the False Claims Act are applicable (*i.e.*, 31 U.S.C. § 3730(e), as amended, October 27, 1986 and May 20, 2009).

Trividia Health between December 8, 2014 and February 12, 2016, first, in the Customer Care department, and then, after six months, in the Post Market Compliance department as an associate. She has personal knowledge about an extraordinarily high number of complaints about test-strip and meter malfunctions, dating back to 2013, and statements from senior management as to knowledge of the defective test strips.

19.    The United States of America (the "United States"), the States of California, Colorado, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, and Washington, the Commonwealths of Massachusetts and Virginia, and the District of Columbia (collectively, the "State Plaintiffs," and collectively with the United States, the "Plaintiffs"), are the real parties in interest to this action. *See United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 231 (1st Cir. 2004).

### B. DEFENDANTS

20.    Defendant **Trividia Health, Inc.** (formerly Home Diagnostics, Inc., and then Nipro Diagnostics, Inc.) is incorporated in Delaware.  It is a wholly owned subsidiary of SinoCare Group, a Chinese company headquartered in Changsha, China.

21.    SinoCare Group consists of Sinocare, Inc., Sinocare Jianheng Diabetes Hospital, and its affiliates Sinocare Inc.  It is listed on the Shenzhen Stock Exchange.  As stated in its press releases, SinoCare purchased Nipro Diagnostics and renamed it Trividia Health to "signal[ ] the company's new trajectory and represent[ ] the values vision and market of the global enterprise." Under SinoCare's watch, Trividia Health has become "a global consumer health and wellness company" with headquarters at N.W. 55th Court, Fort Lauderdale, FL 33309 and principle manufacturing facilities in Taiwan, New Hampshire, and Florida.  Trividia Health is "a leading developer, manufacturer and marketer of advanced performance products for people with diabetes,

including a broad portfolio of blood glucose monitoring supplies and technologies." Trividia Health engaged in the manufacture and interstate distribution of certain defective blood glucose test strips – medical devices intended for human use – including in the District of South Carolina.

22.     **Trividia Manufacturing Solutions, Inc**. is a New Hampshire corporation with its principle place of business at 89 Bridge Street, Lancaster, NH  03584.  Trividia Manufacturing is a wholly owned subsidiary of Trividia Health.  Trividia Manufacturing aided and abetted, among other things, Trividia Health's manufacture and interstate distribution of certain blood glucose test strips – medical devices intended for human use – including in the District of South Carolina.

23.     Defendant **Trividia Healthcare Systems, LLC** is a Florida Limited Liability Company with its principal place of business located at 2400 N.W. 55th Court, Fort Lauderdale, FL 33309.  Trividia Systems aided and abetted, among other things, Trividia Health's manufacture and interstate distribution of certain blood glucose test strips – medical devices intended for human use – including in the District of South Carolina.

24.     Defendant **Trividia Meditech, LLC** is a Florida Limited Liability Company with its principal place of business located at 2400 N.W. 55th Court, Fort Lauderdale, FL 33309.  Trividia Meditech aided and abetted, among other things, Trividia Health's manufacture and interstate distribution of certain blood glucose test strips – medical devices intended for human use – including in the District of South Carolina.

## IV.     STATUTORY AND REGULATORY PROVISIONS APPLICABLE TO DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS

### A. THE GOVERNMENT PROGRAMS

25.     Government-funded programs are among the principal purchasers of Trividia's medical testing products.  These programs include, but are not limited to, Medicare, the Medicaid programs of the State Plaintiffs, TRICARE (formerly CHAMPUS), VA health care benefits, the

Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA"), the Federal Employee Health Benefits Program ("FEHBP"), and the employee health care programs provided by the State Plaintiffs (collectively, the "**Government Programs**").  For the 3-month period of April to June 2016, Defendants' TRUEtest strips comprised 11% of all mail order diabetes test strips associated with Medicare Claims.  The United States and the State Plaintiffs fund the Government Programs with taxpayer money.

26.   Medicare is a federal health program primarily benefiting the elderly that Congress created in 1965 when it adopted Title XVIII of the Social Security Act.  Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS").  Medicare is funded by federal taxes.

27.   Glucose test strips are classified as durable medical equipment ("DME"). 42 U.S.C. § 1395x(n).[8]  DME, in turn, is reimbursed under Medicare Part B. 42 U.S.C. §§ 1395k(a), 1395m(a)(13), 395x(s)(6).  Medicare Part B coverage is expressly limited to items and expenses that are "reasonable and necessary for the diagnosis or treatment of illness or injury." 4 2 U.S.C. §1395y(a)(1)(A).  "For a device to be considered 'reasonable and necessary,' contractors must determine that the item is 'safe and effective; not experimental or investigational . . . ; and appropriate' in terms of both 'accepted medical practice' and 'the patient's medical need.'"  *Almy v. Sebelius*, 679 F.3d 297, 300 (4th Cir. 2012) (quoting Medicare Providers Integrity Manual § 13.5.1, Reasonable and Necessary Provisions in LCDs); *see also Int'l Rehabilitative Scis., Inc. v. Sebelius*, 688 F.3d 994, 1002 (9th Cir. 2012) ("To be 'reasonable and necessary' for treatment, a

---

[8] Title 42 U.S.C. § 1395x(n) provides, in relevant part:

> The term 'durable medical equipment' includes . . . blood-testing strips and blood glucose monitors for individuals with diabetes without regard to whether the individual has Type I or Type II diabetes or to the individual's use of insulin (as determined under standards established by the Secretary in consultation with the appropriate organizations).

device must be 'safe and effective,' . . .'"); *United States ex rel. Modglin v. DJO Global Inc*., 48 F. Supp. 3d 1362, 1372 (C.D. Cal. 2014) (same).

28.     Medically risky items do not qualify as reasonable and necessary, and therefore are not reimbursable under Medicare. *See U.S. ex rel. Cestra v. Cephalon, Inc*., No. 14-1842, 2015 U.S. Dist. LEXIS 71505, No. 14-1842 (E.D. Pa. June 3, 2015) (relator who alleged off-label use of Treanda for front-line treatment of iNHL was medically risky stated a viable claim under the False Claims Act) (interpreting 42 U.S.C. § 1395y(a)(l)(A)); *U.S. ex rel. Bergman v. Abbott Labs*., 995 F. Supp. 2d 357, 373 (E.D. Pa. 2014) (same); *Galmines v. Novartis Pharms. Corp*., No. 06-3213, 2013 U.S. Dist. LEXIS 83100, 2013 WL 2649704, at* 12 (E.D. Pa. June 13, 2013) (same).

29.     Congress created Medicaid at the same time it created Medicare in 1965 when Title XIX was added to the Social Security Act.  Medicaid is a public assistance program providing payment of medical expenses to low-income patients.  Funding for Medicaid is shared between the federal government and state governments and is derived from federal and state taxes.  The federal government also separately matches certain state expenses incurred in administering the Medicaid program.  While specific Medicaid coverage guidelines vary from state to state, Medicaid's coverage is generally modeled after Medicare's coverage.

30.     TRICARE is the health care system of the United States military, administered by the Department of Defense.  It is designed to maintain the health of active-duty service personnel, provide health care during military operations, and offer health care to non-active-duty beneficiaries, including dependents of active-duty personnel and career military retirees and their dependents.  The program operates through various military-operated hospitals and clinics worldwide and is supplemented through contracts with civilian health care providers.  TRICARE is a triple-option benefit program designed to give beneficiaries a choice between health

maintenance organizations, preferred provider organizations, and fee-for-service benefits.  Five managed-care support contractors create networks of civilian health care providers. TRICARE is funded by federal taxes.

31.   Whereas TRICARE treats active duty military and their dependents and military retirees, the Veterans Administration ("VA") provides health care and other benefits to non-TRICARE-eligible veterans of the military through its nationwide network of hospitals and clinics. The VA health programs are funded by federal taxes.

32.   CHAMPVA is a health care program administered by the VA for families of veterans with permanent and total service-connected disabilities, including survivor benefits. CHAMPVA is funded by federal taxes.

33.   The Federal Employees Health Benefits Program ("FEHBP") provides health insurance coverage for more than 8 million federal employees, retirees, and their dependents. FEHBP is a collection of individual health care plans, including the Blue Cross and Blue Shield Association, Government Employees Hospital Association, and Rural Carrier Benefit Plan. FEHBP plans are managed by the Office of Personnel Management and are funded by federal taxes.

34.   The State Plaintiffs administer health care programs for their employees that are funded by state taxes.  For example, New York offer its employees coverage under the New York State Employee Health Insurance Program, or NYSHIP.  NYSHIP is funded by state taxes.

35.   Coverage of medical devices under these programs is similar to the coverage provided by the Medicaid program.  *See, e.g*., TRICARE Policy Manual 6010.47-M, Chapter 7, Section 7.1 (B) (2) (March 15, 2002); CHAMPVA Policy Manual, Chapter 2, Section 22.1, Art. I (A)(2) (June 6, 2002).

## B. MEDICAL DEVICE REGULATIONS

36.    The United States Food and Drug Administration ("FDA") is the federal agency responsible for protecting the health and safety of the public by enforcing the Federal Food, Drug, and Cosmetic Act ("FDCA") and assuring, among other things, that medical devices intended for use in humans are safe and effective for their intended uses and that the labeling of such devices bears true and accurate information.    Pursuant to such responsibility, FDA publishes and administers regulations relating to the approval, manufacture, and distribution of medical devices.

37.    Further, the required FDA approval to market a medical device is

subject to the general controls provisions of the [FDCA]. The general controls provisions of the [FDCA] include requirements for annual registration, listing of devices, good manufacturing practice, labeling, and prohibitions against misbranding and adulteration.

If [a] device is classified (see above) into either class II (Special Controls) or class III (PMA), it may be subject to such additional controls. Existing major regulations affecting [such a] device can be found in Title 21, Code of Federal Regulations (CFR), Parts 800 to 895.

Aug. 19, 2008 FDA Approval Letter in response to Trividia Section 510(k) premarket notification, at 1. http://www.accessdata.fda.gov/cdrh_docs/pdf8/K080641.pdf (accessed Jan. 3, 2017).

### 1. Medical Device Reporting Requirements

38.    As a Class II medical device, *id.*,[9] glucose test strips are regulated by, *inter alia*, 21

---

[9] 21 U.S.C. § 360c provides that a Class II device is

[a] device which cannot be classified as a class I device because the general controls by themselves are insufficient to provide reasonable assurance of the safety and effectiveness of the device, and for which there is sufficient information to establish special controls to provide such assurance, including the promulgation of performance standards, postmarket surveillance, patient registries, development and dissemination of guidelines (including guidelines for the submission of clinical data in premarket notification submissions in accordance with section 510(k) [21 USCS § 360(k)]), recommendations, and other appropriate actions as the Secretary deems necessary to provide such assurance. For a device that is purported or represented to be for a use in supporting or sustaining human life, the Secretary

U.S.C. § 360i and the FDA's Medical Device Reporting ("MDR") regulations. 21 C.F.R. § 803 *et seq*.  Both 21 U.S.C. § 361i the MDR regulations classify two types of adverse events that must be reported by device manufacturers: (a) deaths and serious injuries that a device has or may have caused or contributed to and (b) certain device malfunctions.  21 U.S.C. § 361i; 21 C.F.R. § 803.1; *see also* 21 C.F.R. §§ 803.50 – 803.56 (setting forth timing and content of required reports).  The regulations explain that the various "reports help [the FDA] to protect the public health by helping to ensure that devices are not adulterated or misbranded and are safe and effective for their intended use." 21 C.F.R.§ 803.1.

39.   An "MDR reportable event" is defined by the regulations as

An event that manufacturers or importers become aware of that reasonably suggests that one of their marketed devices:

(i) May have caused or contributed to a death or serious injury, or

(ii) Has malfunctioned and that the device or a similar device marketed by the manufacturer or importer would be likely to cause or contribute to a death or serious injury if the malfunction were to recur.

21 C.F.R. § 803.3(o)(2).

40.   A "malfunction" is defined by 21 C.F.R. § 803.3(k) as

the failure of a device to meet its performance specifications or otherwise perform as intended. Performance specifications include all claims made in the labeling for the device. The intended performance of a device refers to the intended use for which the device is labeled or marketed, as defined in § 801.4 of this chapter.

41.   "[B]ecome aware" for a manufacturer means

when any of [the manufacturer's] employees becomes aware of a reportable event that is required to be reported within 30 calendar days or that is required to be

---

shall examine and identify the special controls, if any, that are necessary to provide adequate assurance of safety and effectiveness and describe how such controls provide such assurance.

reported within 5 work days because [FDA] had requested reports in accordance with § 803.53(b). You are also considered to have become aware of an event when any of your employees with management or supervisory responsibilities over persons with regulatory, scientific, or technical responsibilities, or whose duties relate to the collection and reporting of adverse events, becomes aware, from any information, including any trend analysis, that a reportable MDR event or events necessitates remedial action to prevent an unreasonable risk of substantial harm to the public health.

21 C.F.R. § 803.3(b).

## 2.  Current Good Manufacturing Practice

42.   FDA approval is also subject to compliance with current good manufacturing practice ("cGMP").  Pursuant to 21 U.S.C.S. § 360j(f), device manufacturers must comply with CGMP as specified by regulations codified at 21 C.F.R. § 820 *et seq*.  Among other things, "manufacturers [are required to] develop and follow procedures and fill in the details that are appropriate to a given device according to the current state-of-the-art manufacturing for that specific                                                                                          device."

http://www.fda.gov/medicaldevices/deviceregulationandguidance/postmarketrequirements/qualitysystemsregulations/ (accessed Jan. 5, 2017).  In particular, manufacturers must develop a Quality System ("QS") that complies with the QS regulations and "will result in devices that are safe and effective, and to establish methods and procedures to design, produce, distribute, etc. devices that meet the quality system requirements."  *Id*.  It is the responsibility of a manufacturer's executive management to establish and maintain a QS. 21 C.F.R. § 820.20.

43.   In addition, pursuant to 21 C.F.R. § 820.100, manufacturers must "establish and maintain procedures for implementing corrective and preventive action" ("CAPA").  C.F.R. § 820.100.  CAPA activities must be documented and require procedures for:

(1) Analyzing processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product, and other sources of quality data to identify existing and potential causes of nonconforming product, or

other quality problems. Appropriate statistical methodology shall be employed where necessary to detect recurring quality problems;

(2) Investigating the cause of nonconformities relating to product, processes, and the quality system;

(3) Identifying the action(s) needed to correct and prevent recurrence of nonconforming product and other quality problems;

(4) Verifying or validating the corrective and preventive action to ensure that such action is effective and does not adversely affect the finished device;

(5) Implementing and recording changes in methods and procedures needed to correct and prevent identified quality problems;

(6) Ensuring that information related to quality problems or nonconforming product is disseminated to those directly responsible for assuring the quality of such product or the prevention of such problems; and

(7) Submitting relevant information on identified quality problems, as well as corrective and preventive actions, for management review.

*Id.* at 820.100(a); *see also id*. at § 820.100(b).

### 3. Adulterated and Misbranded Devices

44.    Finally, 21 U.S.C. § 331(a) prohibits medical device manufacturers from "introduc[ing] . . . into interstate commerce [] any . . . device . . . that is . . . adulterated or misbranded."   A device is deemed adulterated if, *inter alia*, its manufacture fails to meet performance standards or specifications or cGMP. 21 U.S.C. §§ 351(e), (h).  A device is deemed misbranded if, *inter alia*, the label fails to provide "adequate warnings against use . . . where its use may be dangerous to health," the device is "[h]ealth-endangering when used as prescribed," or it is a device as to which there has been a failure to report adverse events as required by the MDR and 21 U.S.C. § 360i. 21 U.S.C. §§ 352(f), (j), (t).

45.    The Department of Justice ("DOJ") has a history of enforcing the prohibitions of 21 U.S.C. § 331(a) both criminally and under the False Claims Act.  On March 13, 2013, DOJ announced that generic drug manufacturer "Ranbaxy Laboratories Limited, pleaded guilty today

to felony charges relating to the manufacture and distribution of certain adulterated drugs made at two of Ranbaxy's manufacturing facilities in India." https://www.justice.gov/opa/pr/generic-drug-manufacturer-ranbaxy-pleads-guilty-and-agrees-pay-500-million-resolve-false (accessed Jan. 30, 2017). Ranbaxy also agreed to pay $500 million to resolve criminal as well as civil liability under the False Claims Act and related state laws. *Id.* Similarly, on October 26, 2010, pharmaceutical giant GlaxoSmithKline "agreed to plead guilty to charges relating to the manufacture and distribution of certain adulterated drugs made at GSK's now-closed Cidra, Puerto Rico, manufacturing facility." https://www.justice.gov/opa/pr/glaxosmithkline-plead-guilty-pay-750-million-resolve-criminal-and-civil-liability-regarding (accessed Jan. 30, 2017). GSK agreed to pay $750 million, including "a civil settlement under the False Claims Act and related state claims for $600 million." *Id.*

### C.  THE FALSE CLAIMS ACT AND STATE FALSE CLAIMS ACTS

**46**.   The Federal False Claims Act provides that any person who knowingly presents or causes another to present a false or fraudulent claim for payment or approval is liable for a civil penalty of up to $11,000[10] for each such claim, plus three times the amount of the damages sustained by the government.  31 U.S.C. § 3729(a)(1)(A) & (B).  Liability attaches to anyone who (1) presents or causes to be presented for payment or approval by the United States (2) a false or fraudulent claim, (3) knowing the claim was false or fraudulent. *See* 31 U.S.C. § 3729(b)(2).

**47**.   The quintessential FCA case is one in which a government contractor or supplier provides the government with worthless services.  "[I]in a worthless service claim, the performance of the service is so deficient that for all practical purposes it is the equivalent of no

---

[10] For Trividia conduct that occurred after November 1, 2015, Defendants must pay not less than $10,781.40 and not more than $21,562.80 I for each violation of 31 U.S.C. § 3729 et seq.

performance at all." *U.S. ex rel. Davis v. U.S. Training Ctr., Inc*., 498 F. App'x 308, 315 n.11 (4th Cir. 2012) (citing *Mikes v. Straus*, 274 F.3d 687, 703 (2d Cir. 2001)).

48.    It is also well established that a drug or device manufacturer that causes Government Programs to pay for items that are not reimbursable under the applicable statutes violates the FCA and state analogs. *See, e.g.*, *United States v. Cestra v. Cephalon, Inc*., No. 14-1842, 2015 U.S. Dist. LEXIS 71505 (E.D. Pa. June 3, 2015); *United States ex rel. Galmines v. Novartis Pharms. Corp*., No. 06-3213, 2013 U.S. Dist. LEXIS 83100 (E.D. Pa. June 13, 2013); *Strom ex rel. U.S. v. Scios, Inc*., 676 F. Supp. 2d 884, 891 (N.D. Cal. 2009); *United States ex. rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39 (D. Mass 2001). *See also United States ex rel. Keeler v. Eisai, Inc*., 568 F. App'x 783 (11th Cir. 2014); *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002) (liability attaches to a "health care provider's disregard of Government regulations or improper internal policies [where], as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe").

49.    Although violations of medical device statutes and regulations such as the cGMP and the MDR regulations are not always actionable under the federal and state FCAs, they are actionable when, as here, the violation involves fraudulent activity that causes the submission of claims that are not reimbursable. *Cf. United States ex rel. Conner v. Salina Regional Health Center, Inc*., 543 F.3d 1211, 1219 (10th Cir. 2008); *United States ex rel. Siewick v. Jamieson Science & Engineering, Inc*., 214 F.3d 1372, 1376, 341 U.S. App. D.C. 459 (D.C. Cir. 2000); *United States ex rel. Lamers v. City of Green Bay,* 168 F.3d 1013, 1019 (7th Cir. 1999).

50.    Several states have enacted false claims acts or provisions that apply to Medicaid fraud and/or fraudulent health care claims submitted for payment by municipal funds (the "State False Claims Acts"), including:

- California False Claims Act, Cal. Gov't Code § 12651 *et seq*.

- Colorado Medicaid False Claims Act, Colo. Rev. Stat. §§ 25.5-4-303.5, *et seq*.

- Delaware False Claims and Reporting Act, 6 Del. C. § 1201 *et seq*.

- Florida False Claims Act, Fla. Stat. Ann. § 68.081 *et seq*.

- Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq*.

- Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq*.

- Illinois False Claims Act, 740 ILCS 175/1 *et seq*.

- Indiana False Claims and Whistleblower Protection Act, Burns Ind. Code Ann. § 5-11-5.5-1 *et seq*.

- Iowa False Claims Act, Iowa Code 685 *et seq*.,

- Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:437.1 *et seq*.

- Maryland False Claims Act, Md. Code Ann., Health–Gen. § 2-601 *et seq*.

- Massachusetts False Claims Act, Mass. Ann. Laws ch. 12, § 5B *et seq*.

- Michigan Medicaid False Claims Act, Mich. Comp. Laws Serv. § 400.601 *et seq*.

- Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq*.

- Montana False Claims Act; Mont. Code Anno. § 17-8-401 *et seq*.

- Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq*.

- New Jersey False Claims Act; N.J. Stat. § 2A:32C-1 *et seq*.

- New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq*.

- New York False Claims Act, N.Y. State Fin. Law § 187 *et seq*.

- North Carolina False Claims Act, N.C.G.S. § 1-605 *et seq*.

- Oklahoma Medicaid False Claims Act, 63 Okl. St. § 5053 *et seq*.

- Rhode Island False Claims Act; R.I. Gen. Laws § 9-1.1-1 *et seq.*

- Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*

- Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq.*

- Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*

- Vermont False Claims Act, 32 V.S.A. § 632 *et seq.*

- Washington Medicaid Fraud False Claims Act, Rev. Code Wash.  § 74.66 *et seq.*

- District of Columbia False Claims Act, D.C. Code § 2-381.01 *et seq.*

51.    The State Claims are largely modeled after the federal FCA.

V.      SPECIFIC ALLEGATIONS OF DEFENDANTS' FALSE CLAIMS

A. THE DEFECTIVE TEST STRIPS AND MANAGEMENT INACTION

52.    Since at least 2013 Trividia has knowingly manufactured, sold, and distributed into interstate commerce defective TRUEtest diabetic blood-test strips.

53.    At the beginning of 2013, Trividia placed a new machine into production to manufacture its TRUEtest strips, housing this machine at 2400 N.W. 55th Court, Fort Lauderdale, FL 33309.  Trividia management promptly learned of the defective devices through an immediate and unusual increase in complaints of malfunction.  The new machine that manufactures the vial that contains the test strips was failing to seal the vials.  All of the vials produced since 2013 have not been sealed properly such that the test strips are exposed to air prematurely, rendering them defective and unable to accurately measure glucose levels.  These defects have resulted in patients taking the wrong dose of insulin, going into diabetic coma, and even dying.

54.    In the summer of 2015, senior management – Albert Torrell, Senior Manager of Customer Care, and Zak Khan, Manager of Customer Care, and later Post-Market Compliance Supervisor – repeatedly stated at meetings that the company had invested a lot of money to have

engineers come in to re-calibrate the machine and correct the problem. They lamented that these results were unsuccessful, and the machine continued to produce vials of strips that were prematurely exposed to air. Relator can likewise testify in detail about a large number of complaints about product malfunction and management inaction as to the same. Specifically, when she was hired in December 2014, Relator was told by Khan and Torrell that there was an ongoing high volume of complaints and incoming calls.

55.    Relator was initially hired to work in the Customer Care department and was responsible for receiving calls, including fielding customer complaints. During this time, her department received 300-400 calls every day. Approximately 280 of these calls involved complaints about inaccurate results from the TRUEresult meter/TRUETest strip system.[11] After two months she began to supervise the call staff and train new employees.

56.    In late spring or early summer of 2015 – roughly six months after she was hired – Relator was moved to an associate's position in Trividia Health's Post-Market Compliance Department ("PMC"). Roughly 30 high-risk complaints were routed to the PMC daily to determine whether they needed to be reported to the FDA pursuant to MDR regulations. Thus, Trividia received at least 850 high-risk calls a month that were potentially reportable to the FDA because they either involved device malfunctions or involved death or serious injuries. 21 U.S.C. § 361i; 21 C.F.R. § 803.1; 21 C.F.R. §§ 803.50 – 803.56 (setting forth timing and content of required reports).

57.    About 70% of the calls sent to PMC were considered adverse events and PMC filled out MDRs. But these MDRs were not sent to the FDA. Instead, the MDRs were forwarded to

---

[11] Complaints about other test strips were far more infrequent and were usually the result of improper testing techniques or improper storage, not a manufacturing defect.

Trividia Health's Regulatory Affairs department ("RA") for further review.  Juliana Arias, the RA specialist in charge of screening and sending MDRs to the FDA, only spoke rudimentary English and did not have adequate medical or clinical knowledge to be able to properly assess the MDRs. Relator frequently identified reportable MDRs that Ms. Arias did not send to the FDA.

58.    The following are characteristic of the types of complaints PMC received in large volume:

- On November 13, 2015, Trividia received a letter from Ruth Saunders, who ran a high-risk pregnancy clinic of more than 300 patients called Sweet Success. Saunders wrote "with great concern regarding the Nipro True Result blood glucose meter issued to many of [her] managed care Medical patients."  She explained that the meter was "putting many [ ] patients at risk for pregnancy related complications" and explained how she observed large fluctuations in the meter's ability to test patients' blood glucose correctly.  She discussed how the meter was showing far lower blood sugar levels than other meters when patients changed insurance resulting in use of the TRUEresult meter.  She further explained that she had "started contacting the insurance companies to request that they stop using this meter for patients, as [they] believe[d] that it is putting babies lives at risk related to inaccurate values."  In particular she reported a 37-week-old baby "with fetal demise as th[e baby's mother] was on a True result meter" and expressed her belief that the meter played a part and was "putting providers a[t] risk of inaccurately assessing and treating patients."  In conducting intake, Trividia's Director of Clinical Marketing opined that "[b]ased on this information, it is impossible to determine that the TRUEresult

meter was the root cause of the demise of this baby."  Trividia purported to continue to investigate but as of her departure Relator does not believe this incident had been reported to the FDA.  Trividia unsuccessfully attempted to convince Ms. Saunders to continue to use the TRUEtest system with her patients.

- On February 8, 2016, Trividia received a complaint from customer ███████ ████ ("Customer A"),[12] a gestational diabetic.  The customer complained that her meter had been reading inaccurately.  The TRUEresult meter read her blood sugar at 62mg/dl.  Shortly thereafter, upon arriving at the hospital, her blood sugar was checked with the hospital's Accu-chek[TM], which read 94mg/dl, and "she was put on an IV to regulate sugar."  At the hospital, she was diagnosed with polyhydramnios (the excessive accumulation of amniotic fluid that surrounds the baby in the uterus), which the physician attributed to high blood sugar.  The customer attributed this to Trividia's failing TRUEresult/TRUEtest system and threatened to take legal action.  Senior management Torrell and Khan discussed this case via emails and asked to schedule a call with the customer in which Patricia would participate. Trividia convinced this customer not to file a lawsuit by stressing that it would difficult to prove Trividia's liability.[13]

59.    As evidenced by Customer A's complaint, senior management was aware of the

---

[12] Names have been redacted for privacy reasons.

[13] Relator has documentation of customer complaints for other products.  Although less frequent, they were similarly mishandled.  For example, Relator has evidence that Albert Torrell altered the record of a complaint regarding glucose tablets to avoid reporting an MDR to the FDA.

problems.  Indeed, Torrell and Khan were well aware that the machine making the test strips was defective and could not be fixed and were aware of the volume of complaints.  Relator had also personally complained to Khan, Torrell, and Director of Regulatory Affairs Karen DeVincent, but her complaints and suggested procedures were ignored.  Rather than addressing the problem, management chose to bury it.  Management expressly discussed initiating a recall of the defective TRUEresult/TRUEtest system around the time of Ruth Saunders' complaint in November or December of 2015, but chose not to recall the product because it would hurt profitability and the company would be unable to pay Christmas bonuses.  Despite a long history of complaints of inaccurate readings, hospitalizations, and fetal deaths, such as the complaints detailed above, Trividia kept the defective TRUEresult/TRUEtest system on the market for roughly 6 more months.

60.   As explained above, FDA regulations require MDRs to be filed with the FDA for any event

that reasonably suggests that one of their marketed devices:

(i) May have caused or contributed to a death or serious injury, or

(ii) Has malfunctioned and that the device or a similar device marketed by the manufacturer or importer would be likely to cause or contribute to a death or serious injury if the malfunction were to recur.

21 C.F.R. § 803.3(o)(2).

61.   Trividia, however, would not file an MDR if the patient sought medical attention but was not hospitalized or did not suffer serious injury or health complications.  Instead, the tickets were closed in Trividia's system with a closing statement claiming that no MDR was needed.  At best, Trividia only filed MDRs when a patient suffered serious health complications, but it often violated obligations to do so even in these cases by falsely deeming the injury not causally connected to its test strips.

62.    Trividia also purposefully abdicated its responsibilities to undertake a reasonable investigation to obtain the information needed to determine if events were reportable.   For example, Relator had created a variety of scripts for the Customer Care Department to use in order to capture the medical condition of the patient and other necessary information to properly determine whether the product was defective or the malfunction was a result of user error.   These scripts were not used because Trividia wanted to underdiagnose and underreport material adverse events to the FDA.   Nonetheless, Relator believes that records of the complaints remain in Trividia's system.

63.    In failing to report these errors of failed test strips to the FDA, Trividia intentionally ignored the requirement of reporting events when the device has malfunctioned and it or another similar device is likely to do so again with more serious consequences.   *Id*. at § 803.3(o)(2)(ii).   Because, as Trividia well knew, the defective test strips were caused by a manufacturing problem, and not an individual patient's handling of them, all adverse events that were caused by malfunctioning test strips should have been reported to the FDA.   Instead, Trividia omitted these reports, a "half truth" that misrepresented to FDA the frequency and cause of product malfunctions.

64.    Patients who complained about the test strips were asked to return them.   When they did, the strips were sent to Trividia's lab to be investigated.   If the test strip was found to be defective for so-called "Black Chemistry" – meaning the test strip was exposed to humidity and more than 75º air temperature, such that it caused a black reaction on the test strip – the MDR was sent to the FDA in some cases.   But for any other outcome, Trividia would deem strip malfunction to be a product of customer error – such as  improper storage — and such MDRs were never sent to the FDA.   Instead, they were deleted from the system.

65.    Trividia finally initiated a voluntary "correction and removal action" on June 28,

2016 for several test strips, including the TRUEtest. *See*

http://www.businesswire.com/news/home/20160628006609/en/Trividia-Health-Initiates-

Voluntary-Recall-Lots-TRUEread%C2%AE (accessed January 1, 2017).

66.    At least the following productions of Trividia test strips – comprising 5,527,921

units – were affected:

Strip Lot #: PS2265 PS2283 PS2285 PS2281 PS2278 PS2276 PS2275 PS2215
PS2271 PS2279 PS2209 PS2299 PS2274 PS2280 PS2219 PS2277 PS2268
PS2282 PS2296 PS2288 PS2284 PS2291 PS2287 PS2286 PS2297 PS2252 PS2293
PS2302 PS2292 PS2313 PS2270 PS2190 PS2189 PS2290 PS2298 PS2303 PS2289
PS2294 PS2295 PS2300 PS2304 PS2325 PS2312 PS2311 PS2305 PS2306 PS2315
PS2301 PS2314 PS2310 PS2347 PS2309 PS2318 PS2395 PS2320 PS2321 PS2316
PS2317 PS2330 PS2327 PS2324 PS2323 PS2333 PS2326 PS2328 PS2334 PS2329
PS2331 PS2332 PS2336 PS2335 PS2340 PS2345 PS2308 PS2341 PS2339 PS2307
PS2343 PS2353 PS2352 PS2338 PS2348 PS2342 PS2355 PS2344 PS2359 PS2362
PS2357 PS2349 PS2376 PS2356 PS2350 PS2367 PS2351 PS2346 PS2354 PS2371
PS2360 PS2366 PS2364 PS2370 PS2355SER PS2363 PS2319 PS2365 PS2361
PS2368 PS2372 PS2381 PS2369 PS2377 PS2392 PS2380 PS2374 PS2375 PS2373
PS2378 PS2379 PS2382 PS2380SER PS2383 PS2389 PR2068 PS2393 PS2384
PS2400 PS2391 PS2401 PS2402 PS2408 PS2388 PS2386 PS2387 PS2390 PS2385
PS2399 PS2396 PS2406 PS2398 PS2409 PS2337 PS2397 PS2404 PS2403 PS2322
PS2412 PS2416 PS2417 PS2419 PS2418 PS2420 PS2405 PS2413 PS2414 PS2394
PS2411 PS2415 PS2421 PS2267INT PS2336ILA PS2190IGB PS2267IGB
PR2122INT PS2189INT PS2319INT PS2252ILA PS2345INT PS2279ILA
PS2319IGB PS2407IGB PS2322IGB PS2349ITT PS2394ILA PS2307ILA
PS2309ILA PS2308ILA PS2415INT PS2351ILA PS2337ILA PS2415ILA
PS2411ILA PS2384ILA PS2394INT PS2413ILA PR2156INT PS2284ICA
PS2316ICA PS2335ICA RS4646 RS4631 RS4649 RS4645 RS4652 RS4641
RS4653 RS4638 RS4612 RS4644 RS4655 RS4669 RS4567 RS4639 RS4605
RS4659 RS4654 RS4657 RS4608 RS4660 RS4662 RS4634 RS4676 RS4670
RS4665 RS4544 RS4674 RS4607 RS4688 RS4673 RS4667 RS4678 RS4680
RS4686 RS4677 RS4679 RS4695 RS4699 RS4703 RS4689 RS4704 RS4692
RS4694 RS4698 RS4663 RS4705 RS4708 RS4719 RS4710 RS4715 RS4717
RS4714 RS4723 RR4521 RS4716 RS4724 RS4645IGB RS4567ICA RS4704ICA
DR4559 DS4648 DS4624 DS4658 DS4579 DS4672 DR4559IBR DR4559INT
DS4624INT DS4648IBR DS4658INT DS4658IBR DS4624IBR DS4579IBR
DS4711INT DS4672INT BS4643 BS4640 BS4650 BS4668 BS4661 BS4588
BS4651 BS4621 BS4664 BS4615 BS4675 BS4666 BS4629 BS4687 BS4681
BS4696 BS4700 BS4707 BS4693 BS4671 BS4690 BS4697 BS4701 BS4706
BS4709 BS4713 BS4720 BS4682 BS4683 BS4721 BS4643INT BS4588INT

BS4697INT  BS4651INT  BS4629INT  BS4682IAT  BS4629IAT  BS4602INT
BS4666INT  BS4682INT  BS4603INT  BS4671IAT. Kit Lot #: KS0967 KS1022
KS1214 KS1312 KS1154 KS1688 KS1631 KS1301 ks1133 KS1341 KS1063
KS1109 KS0968 ks1449 KS1340 KS1032 KS1266 KS1714 KS1910 KS1473
KS1546 KS1524 KS1759 KS1152 ks1108 KS1153 KS1243 KS1790 KS1763
KS1132 KS1306 KS0981 ks1323 KS1175 KS1909 KS1426 KS1215 KS1687
KS1533 KS1300 KS1643 KS1360 KS1779 KS1671 KS1933 KS1943 KS1597
KS1020 KS1417 KS1488 KS1730 KS1732 KS1496 KS1650 KS1469 KS2235
KS1501 KS1736 KS1531 KS1107 KS1580 KS1021 KS1267 KS1051 KS1646
KS1483 KS1363 KS1925 KS1659 KS0994 KS1028 KS1369 KS1627 KS1049
KS1389 KS1701 KS1053 KS1048 KS1444 KS1176 KS1364 KS0980 KS1147
KS1797 KS1957 KS1459 KS1497 KS1767 KS1311 S1700 S1700, KS1474
KS1276 KS1532 KS1792 KS1542 KS1366 KS1339 KS0988 KS1268 KS1445
ks1045 KS1447 KS1362 KS1545 KS1725 KS1692 ks1434 KS2217 KS1543
KS1031 KS1047 KS1295 KS2260 KS1764 KS1189 KS1726 KS1510 KS1278
KS2415 KS1258 KS1748 KS0996 KS1734 KS1121 KS1724 KS1187 KS1574
KS1422 KS2324 KS1365 KS1023 KS1594 KS1525 KS2373 KS1303 KS1448
KS2449 KS1534 ks1188 ks1443 KS1661 KS1930 KS2437 KS1230 KS0970ITH
KS1423 KS1999ITH KS1418ITH KS1134ITH KS1229 KS1228 KS0818
KS1030ITH KS1419ITH KS1241 KS1941 KS1796 KS1954 KS1190 KS1281
KS1559 KS1489 KS1737 KS1927 KS1326 KS1560 KS1528 KS1000 KS1162
KS1453 KS1942 KS0993 KS1145 KS1944 KS1751 KS1320 KS0995 KS1441
KS1747 KS1277 KS1052 KS1599 KS1752 KS1217 KS1731 KS1013 KS1302
KS1553 KS1928 KS1186 KS1395 KS1144 KS1544 KS1487 KS1697 KS1940
KS1762 KS2414 KS1465 KS1917 KS2417 KS1468 KS1143 KS1089 KS2418
KS1116 KS1500 KS1006 KS1535 KS1704 KS1071 KS1288 KS1626 KS1628
KS2323 KS1070 KS1115 KS1446 KS0992 KS1573 KS0999 KS1705 KS1750
KS1221 KS1127 KS1567 KS1527 KS1557 KS2453 KS2971 KS1406 KS1680
KS1682 KS1056

*Id*. But the recall only covered TRUEtest test strip lots that were packaged from April 16, 2015 through July 30, 2015. *Id.* Thus, many other defective lots that Trividia previously had knowingly introduced into commerce were not covered. This small recall was perfect cover for Trividia to quietly discontinue the brand without acknowledging that TRUEtest strips had been defective for years and Trividia did nothing about it.

67. A majority of the recalled lots are the TRUEtest strip, and the TRUEtest strip and corresponding TRUEresult meter are the only products Trividia has permanently discontinued. Moreover, in a "Customer Care Talking Points" memo to employees, Trividia instructed employees to falsely represent to consumers and customers that the TRUEtest strips and

TRUEresult meters were being phased out to allow the company to upgrade to superior TRUEmetrix technology and falsely claimed that discontinuation "is not the result of any performance issues" as "[m]ost TRUEtset users…have been happy with their experience using the TRUEtest product."  On the contrary, the manufacturing problem has existed since 2013, and continued up until Trividia's recall and discontinuation of the TRUEtest strip/TRUEresult meter system.

### B. TRIVIDIA VIOLATED THE FDCA AND THE FALSE CLAIMS ACT AND STATE ANALOGS

68.   With full knowledge of the defects, Trividia continued to introduce into interstate commerce adulterated and misbranded test strips, in violation of 21 U.S.C. § 331(a). Trividia's failure to manufacture and pack the test strips in conformity with performance standards or specifications or cGMP, as required by 21 U.S.C. §§ 351(e), (h), rendered them adulterated devices. Trividia's failure to adequately warn in the test strip labels that their "use may be dangerous to health" and that the device is "[h]ealth-endangering when used as prescribed," as well as Trividia's failure to properly report adverse events, as discussed *supra*, as required by 21 U.S.C. §§ 352(f), (j), (t), rendered them misbranded devices.

69.   Each of the affected product lots was entirely worthless because they contained defective strips. *See supra* ¶¶ 53-67.  The sole purpose of these test strips was to provide accurate readings of patient glucose levels.  Thus, this case is less like those in which a patient receives deficient medical care, but still receives some level of care, and more like cases in which the purchased gun does not shoot.

70.   Trividia's defective test strips failed to satisfy their one and only purpose, thus providing no value whatsoever.  In fact, Trividia's test strips had a *negative* value, endangering the health and lives of customers.  Thus, any reimbursements by the Government Programs for

these affected test strips were for worthless services, in violation of the FCA and state analogs. Trividia also caused claims to be made to the Government Programs that misrepresented the quality of its test strips in an effort to achieve an unwarranted payment for inferior goods that had no value whatsoever.

71.    In addition, each of these product lots was unreimbursable by the Government Programs because they contained materially defective test strips that were medically risky and potentially "[h]ealth-endangering when used as prescribed." As such they were not reasonable and necessary, as required for reimbursement by statute. *See supra* ¶¶ 27-28.

72.    Moreover, as it is for all medical devices, the FDA's approval of Trividia to market its test strips was conditioned on Trividia's compliance with all applicable statutes and regulations, including the cGMP and MDR regulations set forth above.  Aug. 19, 2008 FDA Approval Letter in response to Trividia Section 510(k) premarket notification, at 1 (available at http://www.accessdata.fda.gov/cdrh_docs/pdf8/K080641.pdf (accessed Jan. 3, 2017)).

73.    Trividia did not comply with cGMP because

- it failed to establish and maintain an adequate QS, as required by 21 CFR § 820.20.

- it failed to establish and maintain adequate CAPA procedures, as required by 21 C.F.R. § 820.100.

74.    Nor were the defective strips and resulting adverse events reported properly to FDA, as required by the MDR, 21 C.F.R. §§ 803 *et seq*., in violation of 21 U.S.C. §§ 331(e) and 360i. Pursuant to these regulations, Trividia had a duty to report defective products and adverse events. Trividia's failure to fulfill that duty constitutes fraud by omission.

75.    Each of these product lots was also unreimbursable by the Government Programs

because, as adulterated and misbranded devices, they were not reasonable and necessary, as required for reimbursement.

76.   Moreover, devices that are adulterated or misbranded cannot by definition be legally sold. Trividia, knowing that the very act of offering its devices certified that the same had been manufactured in compliance with the law, manufactured, sold, distributed, and caused the Government Programs to pay for adulterated or misbranded devices. The Government Programs would not have purchased and paid for these adulterated and misbranded devices if they had known that Trividia, and each Defendant, was violating 21 U.S.C. § 331(a).

77.   Significantly, the FDA's determination that a recall was in fact required, http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfRES/res.cfm?id=148492, demonstrates the materiality of Trividia's failure to report the defective strips and resulting adverse events. *See* 21 CFR § 810.10 (FDA may issue mandatory recall if it "finds that there is a reasonable probability that a device intended for human use would cause serious, adverse health consequences or death"). Although Trividia reported the reason for the recall as simply "Product gives incorrect low blood glucose levels," the FDA determined that the reason for the recall was "Nonconforming Material/Component." The FDA's confirmation of a recall is the equivalent of the withdrawal of approval for the recalled lots. It is also evidence that the Government Programs would not have reimbursed for the recalled lots of test strips had they been notified of the possible defects.

78.   Likewise, CMS – in the case of Theranos, Inc., a consumer health technology company – shut down one of Theranos's labs for gross deficiencies that rendered the products it produced utterly useless and unable to provide any value.[14]

---

[14]   *See, e.g.,*   https://news.theranos.com/2016/07/07/theranos-receives-notice-of-sanctions-from-the-centers-for-medicare-medicaid-services/ (accessed Jan. 31, 2017).

79. In short, Trividia's gross regulatory violations that endangered customers' lives and resulted in the production of medical devices with no value whatsoever are highly material to every regulatory body that governs its ability to (1) operate, (2) sell and distribute medical devices; and (3) obtain reimbursement for these medical devices.

## VI.    COUNTS

**COUNT ONE**
**Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)[15]**
**Against All Defendants**

80. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

81. This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

82. By virtue of the conduct described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment to federal health care programs.

83. The United States, unaware of the AKS violations or the false or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

84. By reason of these payments, the United States has been damaged and continues to be damaged, in a substantial amount.

---

[15] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3730(a)(1) (2006).

## COUNT TWO
### Federal False Claims Act, 31 U.S.C. § 3729 (a)(1)(C)[16]
### Against All Defendants

85.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

86.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

87.    In creating and implementing the kickback scheme described above, Defendants conspired to commit violations of 31 U.S.C. § 3729(a)(1)(A).

88.    The United States, unaware of the false or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

89.    By reason of these payments, the United States has been damaged and continues to be damaged in a substantial amount.

## COUNT THREE
### California False Claims Act, Cal. Gov't Code § 12651 *et seq*.
### Against All Defendants

90.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

91.    This is a claim for treble damages and civil penalties under the California False Claims Act, Cal. Gov't Code § 12651 *et seq*., filed pursuant to Cal. Gov. Code § 12652(c)(1).

92.    By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the California Medicaid Program (*i.e.*, Medi-Cal) false or fraudulent

---

[16] To the extent wrongdoing occurred prior to May 20, 2009, this Amended Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, e.g. 31 U.S.C. § 3730 (a)(3).

claims for payment or approval.

93.     Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the California False Claims Act.

94.     The California Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

95.     By reason of these payments, the California Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

<b>COUNT FOUR</b><br>
<b>Colorado Medicaid False Claims Act, Colo. Rev. Stat. §§ 25.5-4-303.5, <i>et seq</i>.</b><br>
<b>Against All Defendants</b>

96.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

97.     This is a claim for treble damages and civil penalties under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. §§ 25.5-4-303.5, <i>et seq</i>., filed pursuant to Colo. Rev. Stat. § 25.5-4-306(2).

98.     By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Colorado Medicaid Program false or fraudulent claims for payment or approval.

99.     Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Colorado Medicaid False Claims Act.

100.    The Colorado Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

101.    By reason of these payments, the Colorado Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT FIVE
### Delaware False Claims and Reporting Act, 6 Del. C. § 1201 *et seq.*
### Against All Defendants

102. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

103. This is a claim for treble damages and civil penalties under the Delaware False Claims and Reporting Act, 6 Del. C. § 1201 *et seq.*, filed pursuant to 6 Del. C. § 1203(b)(1).

104. By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Delaware Medicaid program false or fraudulent claims for payment or approval.

105. Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Delaware False Claims and Reporting Act.

106. The Delaware Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

107. By reason of these payments, the Delaware Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT SIX
### Florida False Claims Act, Fla. Stat. Ann. § 68.081 *et seq.*
### Against All Defendants

108. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

109. This is a claim for treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. Ann. § 68.081 *et seq.*, filed pursuant to Fla. Stat. Ann. § 68.083(2).

110. By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Florida Medicaid Program false or fraudulent claims for payment or

approval.

111. Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Florida False Claims Act.

112. The Florida Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

113. By reason of these payments, the Florida Medicaid Program has been damaged and continues to be damaged in a substantial amount.

**COUNT SEVEN**
**Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq*.**
**Against All Defendants**

114. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

115. This is a claim for treble damages and civil penalties under the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq*., filed pursuant to Ga. Code Ann. § 49-4-168.2(b).

116. By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Georgia Medicaid Program false or fraudulent claims for payment or approval.

117. Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Georgia False Medicaid Claims Act.

118. The Georgia Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

119. By reason of these payments, the Georgia Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT EIGHT
### Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*
### Against All Defendants

120.   Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

121.   This is a claim for treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*, filed pursuant to Haw. Rev. Stat. § 661-25.

122.   By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Hawaii Medicaid Program false or fraudulent claims for payment or approval.

123.   Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Hawaii False Claims Act.

124.   The Hawaii Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

125.   By reason of these payments, the Hawaii Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT NINE
### Illinois False Claims Act, 740 ILCS 175/1 *et seq.*
### Against All Defendants

126.   Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

127.   This is a claim for treble damages and civil penalties under the Illinois False Claims Act, 740 ILCS 175/1 *et seq.*, filed pursuant to 740 ILCS 175/4(b)(1).

128.   By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Illinois Medicaid Program false or fraudulent claims for payment or

approval.

129.   Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Illinois False Claims Act.

130.   The Illinois Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

131.   By reason of these payments, the Illinois Medicaid Program has been damaged and continues to be damaged in a substantial amount.

**COUNT TEN**
**Indiana False Claims and Whistleblower Protection Act,**
**Burns Ind. Code Ann. § 5-11-5.5-1 *et seq.***
**Against All Defendants**

132.   Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

133.   This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Burns Ind. Code Ann. § 5-11-5.5-1 *et seq*., filed pursuant to Burns Ind. Code Ann. § 5-11-5.5-4(a).

134.   By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Indiana Medicaid Program false or fraudulent claims for payment or approval.

135.   Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Indiana False Claims and Whistleblower Protection Act.

136.   The Indiana Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

137.   By reason of these payments, the Indiana Medicaid Program has been damaged and

continues to be damaged in a substantial amount.

## COUNT ELEVEN
### Iowa False Claims Act, Iowa Code 685 *et seq*.,

138. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

139. This is a claim for treble damages and civil penalties under the Iowa False Claims Act, Iowa Code 685, *et seq.*, filed pursuant to Iowa Code § 685.3.2.a.

140. By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Iowa Medicaid Program false or fraudulent claims for payment or approval.

141. Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Iowa False Claims Act.

142. The Iowa Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

143. By reason of these payments, the Iowa Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT TWELVE
### Louisiana Medical Assistance Programs Integrity Law,
### La. Rev. Stat. Ann. § 46:437.1 *et seq.*
### Against All Defendants

144. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

145. This is a claim for treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:437.1 *et seq.*, filed pursuant to La. Rev. Stat. Ann. § 46:439.1.

146.   By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Louisiana Medicaid Program false or fraudulent claims for payment or approval.

147.   Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Louisiana Medical Assistance Programs Integrity Law.

148.   The Louisiana Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

149.   By reason of these payments, the Louisiana Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT THIRTEEN
### Maryland False Claims Act, Md. Code Ann., Health–Gen. § 2-601 *et seq.* Against All Defendants

150.   Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

151.   This is a claim for treble damages and civil penalties under the Maryland False Claims Act, Md. Code Ann., Health–Gen. § 2-601 *et seq.*, filed pursuant to Md. Code Ann., Health–Gen. § 2-603.

152.   By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Maryland Medicaid Program false or fraudulent claims for payment or approval.

153.   Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Maryland False Claims Act.

154.   The Maryland Medicaid Program, unaware of the false or fraudulent nature of the

claims caused by Defendants, paid for claims that otherwise would not have been allowed.

155.  By reason of these payments, the Maryland Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT FOURTEEN
### Massachusetts False Claims Act, Mass. Ann. Laws ch. 12, § 5B *et seq*.
### Against All Defendants

156.  Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

157.  This is a claim for treble damages and civil penalties under the Massachusetts False Claims Act, Mass. Ann. Laws Ch. 12, § 5B-O, filed pursuant to Mass. Ann. Laws ch. 12, § 5C(2).

158.  By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Massachusetts Medicaid Program false or fraudulent claims for payment or approval.

159.  Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Massachusetts False Claims Act.

160.  The Massachusetts Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

161.  By reason of these payments, the Massachusetts Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT FIFTEEN
### Michigan Medicaid False Claims Act, Mich. Comp. Laws Serv. § 400.601 *et seq*.
### Against All Defendants

162.  Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

163.  This is a claim for treble damages and civil penalties under the Michigan Medicaid

False Claims Act, Mich. Comp. Laws Serv. § 400.601 *et seq*., filed pursuant to Mich. Comp. Laws Serv. § 400.610a(1).

164. By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Michigan Medicaid Program false or fraudulent claims for payment or approval.

165. Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Michigan Medicaid False Claims Act.

166. The Michigan Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

167. By reason of these payments, the Michigan Medicaid Program has been damaged and continues to be damaged in a substantial amount.

**COUNT SIXTEEN**
**Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq*.**
**Against All Defendants**

168. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

169. This is a claim for treble damages and civil penalties under the Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq*., filed pursuant to Minn. Stat. § 15C.05(a).

170. By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Minnesota Medicaid Program false or fraudulent claims for payment or approval.

171. Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Minnesota False Claims Act.

172. The Minnesota Medicaid Program, unaware of the false or fraudulent nature of the

claims caused by Defendants, paid for claims that otherwise would not have been allowed.

173.  By reason of these payments, the Minnesota Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT SEVENTEEN
**Montana False Claims Act; Mont. Code Anno. § 17-8-401 *et seq*.**
**Against All Defendants**

174.  Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

175.  This is a claim for treble damages and civil penalties under the Montana False Claims Act; Mont. Code Anno. § 17-8-401 *et seq*., filed pursuant to Mont. Code Anno. § 17-8-401(1).

176.  By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Montana Medicaid Program false or fraudulent claims for payment or approval.

177.  Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Montana False Claims Act.

178.  The Montana Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

179.  By reason of these payments, the Montana Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT EIGHTEEN
**Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq*.**
**Against All Defendants**

180.  Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

181.   This is a claim for treble damages and civil penalties under the Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq.*, filed pursuant to Nev. Rev. Stat. Ann. § 357.080.1.

182.   By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Nevada Medicaid Program false or fraudulent claims for payment or approval.

183.   Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Nevada False Claims Act.

184.   The Nevada Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

185.   By reason of these payments, the Nevada Medicaid Program has been damaged and continues to be damaged in a substantial amount.

**COUNT NINETEEN**
**New Jersey False Claims Act; N.J. Stat. § 2A:32C-1 *et seq.***
**Against All Defendants**

186.   Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

187.   This is a claim for treble damages and civil penalties under the New Jersey False Claims Act; N.J. Stat. § 2A:32C-1 *et seq.*, filed pursuant to N.J. Stat. § 2A:32C-5.

188.   By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the New Jersey Medicaid Program false or fraudulent claims for payment or approval.

189.   Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the New Jersey False Claims Act.

190.   The New Jersey Medicaid Program, unaware of the false or fraudulent nature of the

claims caused by Defendants, paid for claims that otherwise would not have been allowed.

191. By reason of these payments, the New Jersey Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT TWENTY
### New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq*.
### Against All Defendants

192. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

193. This is a claim for treble damages and civil penalties under the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq*., filed pursuant to N.M. Stat. Ann. § 27-14-7.B.

194. By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the New Mexico Medicaid Program false or fraudulent claims for payment or approval.

195. Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the New Mexico Medicaid False Claims Act.

196. The New Mexico Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

197. By reason of these payments, the New Mexico Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT TWENTY-ONE
### New York False Claims Act, N.Y. State Fin. Law § 187 *et seq*.
### Against All Defendants

198. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

199. This is a claim for treble damages and civil penalties under the New York False Claims Act, N.Y. State Fin. Law § 187 *et seq.*, filed pursuant to N.Y. State Fin. Law § 187.2(a)

200. By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the New York Medicaid Program false or fraudulent claims for payment or approval.

201. Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the New York False Claims Act.

202. The New York Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

203. By reason of these payments, the New York Medicaid Program has been damaged and continues to be damaged in a substantial amount.

### COUNT TWENTY-TWO
### North Carolina False Claims Act, N.C.G.S. § 1-605 *et seq.*
### Against All Defendants

204. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

205. This is a claim for treble damages and civil penalties under the North Carolina False Claims Act, N.C.G.S. § 1-605 *et seq.*, filed pursuant to N.C. Gen. Stat. § 1-608(b).

206. By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the North Carolina Medicaid Program false or fraudulent claims for payment or approval.

207. Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the North Carolina False Claims Act.

208. The North Carolina Medicaid Program, unaware of the false or fraudulent nature

of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

209.   By reason of these payments, the North Carolina Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT TWENTY -THREE
### Oklahoma Medicaid False Claims Act, 63 Okl. St. § 5053 *et seq.*
### Against All Defendants

210.   Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

211.   This is a claim for treble damages and civil penalties under the Oklahoma Medicaid False Claims Act, 63 Okl. St. § 5053 *et seq.*, filed pursuant to 63 Okl. St. § 5053.2.B.1.

212.   By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Oklahoma Medicaid Program false or fraudulent claims for payment or approval.

213.   Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Oklahoma Medicaid False Claims Act.

214.   The Oklahoma Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

215.   By reason of these payments, the Oklahoma Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT TWENTY-FOUR
### Rhode Island False Claims Act; R.I. Gen. Laws § 9-1.1-1 *et seq.*
### Against All Defendants

216.   Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

217.   This is a claim for treble damages and civil penalties under the Rhode Island False

Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.*, filed pursuant to R.I. Gen. Laws § 9-1.1-4(b)(1).

218.  By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Rhode Island Medicaid Program false or fraudulent claims for payment or approval.

219.  Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Rhode Island False Claims Act.

220.  The Rhode Island Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

221.  By reason of these payments, the Rhode Island Medicaid Program has been damaged and continues to be damaged in a substantial amount.

**COUNT TWENTY-FIVE**
**Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.***
**Against All Defendants**

222.  Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

223.  This is a claim for treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*, filed pursuant to Tenn. Code Ann. § 71-5-183(b)(1).

224.  By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Tennessee Medicaid Program false or fraudulent claims for payment or approval.

225.  Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Tennessee Medicaid False Claims Act.

226.  The Tennessee Medicaid Program, unaware of the false or fraudulent nature of the

claims caused by Defendants, paid for claims that otherwise would not have been allowed.

227.   By reason of these payments, the Tennessee Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT TWENTY-SIX
### Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq.* Against All Defendants

228.   Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

229.   This is a claim for treble damages and civil penalties under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq.*, filed pursuant to Tex. Hum. Res. Code § 36.101(a).

230.   By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Texas Medicaid Program false or fraudulent claims for payment or approval.

231.   Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Texas Medicaid Fraud Prevention Act.

232.   The Texas Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

233.   By reason of these payments, the Texas Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT TWENTY-SEVEN
### Vermont False Claims Act, 32 V.S.A. § 632 *et seq.* Against All Defendants

234.   Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

235.    This is a claim for treble damages and civil penalties under the Vermont False Claims Act, 32 V.S.A. § 632 *et seq.*, filed pursuant to 32 V.S.A. § 632(b)(1).

236.    By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Vermont Medicaid Program false or fraudulent claims for payment or approval.

237.    The Vermont Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

238.    By reason of these payments, the Vermont Medicaid Program has been damaged and continues to be damaged in a substantial amount.

**COUNT TWENTY-EIGHT**
**Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.***
**Against All Defendants**

239.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

240.    This is a claim for treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*, filed pursuant to Va. Code Ann. § 8.01-216.5.

241.    By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Virginia Medicaid Program false or fraudulent claims for payment or approval.

242.    The Virginia Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

243.    By reason of these payments, the Virginia Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT TWENTY-NINE
**Washington Medicaid Fraud False Claims Act, Rev. Code Wash. § 74.66 *et seq*.**
**Against All Defendants**

244.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

245.     This is a claim for treble damages and civil penalties under the Washington Medicaid Fraud False Claims Act, Rev. Code Wash. § 74.66 *et seq*., filed pursuant to Rev. Code Wash. § 74.66.050(1).

246.     By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Washington Medicaid Program false or fraudulent claims for payment or approval.

247.     Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the Washington Medicaid Fraud False Claims Act.

248.     The Washington Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

249.     By reason of these payments, the Washington Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## COUNT THIRTY
**District of Columbia False Claims Act, D.C. Code § 2-381.01 *et seq*.**
**Against All Defendants**

250.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

251.     This is a claim for treble damages and civil penalties under the District of Columbia False Claims Act, D.C. Code § 2-381.01 *et seq*., filed pursuant to D.C. Code § 2-381.03(b)(1).

252.     By virtue of the conduct described above, Defendants knowingly presented or

caused to be presented to the District of Columbia Medicaid Program false or fraudulent claims for payment or approval.

253.    Moreover, in creating and implementing the kickback scheme described above, Defendants conspired to commit violations of the District of Columbia False Claims Act.

254.    The District of Columbia Medicaid Program, unaware of the false or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

255.    By reason of these payments, the District of Columbia Medicaid Program has been damaged and continues to be damaged in a substantial amount.

## VII.    PRAYER FOR RELIEF

**WHEREFORE**, Relator requests that judgment be entered against Defendants, ordering that:

a.    Defendants cease and desist from violating the Anti-Kickback Statute, 42 U.S.C. the False Claims Act, 31 U.S.C. § 3729 *et seq*., and the State False Claims Acts;

b.    Defendants pay not less than $5,500 and not more than $11,000[17] for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Defendants' actions, plus the appropriate amount under each of the State False Claims Acts;

c.    The Relator be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d) and similar provisions of the State False Claims Acts;

d.    The Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d) and similar provisions of the State False Claims Acts;

e.    Defendants be enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

---

[17] For Trividia conduct that occurred after November 1, 2015, Defendants pay not less than $10,781.40 and not more than $21,562.80 for each violation of 31 U.S.C. § 3729 et seq.

f.      Defendants disgorge all sums by which they have been enriched unjustly by their wrongful conduct; and

g.      The United States, the State Plaintiffs, and the Relator recover such other relief as the Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator demands a jury trial.

Dated: February 2, 2017

Respectfully submitted,

/s/ Frances C. Trapp
Frances C. Trapp, Fed. ID No. 6376
fran@billnettleslaw.com
**BILL NETTLES, ATTORNEY AT LAW**
2008 Lincoln St.
Columbia, SC 29201
Tel: (803) 814-2826

**GUTTMAN, BUSCHNER & BROOKS PLLC**
Reuben A. Guttman (*pro hac vice* pending)
rguttman@gbblegal.com
Traci L. Buschner (*pro hac vice* pending)
tbuschner@gbblegal.com
Elizabeth H. Shofner (*pro hac vice* pending)
lshofner@gbblegal.com
2000 P Street, N.W., Suite 300
Washington, DC 20036
Tel: 202-800-3001
Fax: 202-827-0041

Justin S. Brooks (*pro hac vice* pending)
jbrooks@gbblegal.com
1515 Locust Street, Suite 501
Philadelphia, PA 19102
Tel: 302-327-9210
Fax: 202-827-0041

**FREIDIN BROWN P.A.**
Philip Freidin
FL Bar No: 118519 (*pro hac vice* pending)
pf@fblawyers.net
Gregory S. d'Incelli
FL Bar No: 66171 (*pro hac vice* pending)
Suite 3100, One Biscayne Tower
2 South Biscayne Boulevard
Miami, Florida 33131
Tel: 305-371-3666
Fax: 305-371-6725